**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ROGERS GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:25-cv-1210** |
| | ) | **District Judge Campbell** |
| **MICHAEL REED, REED ALABAMA,** | ) | |
| **INC., and REED MAINTENANCE** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION AND MOTION FOR REFERRAL TO MEDIATION**

---

Come now Defendants Michael Reed, Reed Alabama, Inc. ("Reed Alabama"), and Reed Maintenance Services, Inc. ("Reed Maintenance"), by and through counsel, and in response in opposition to Plaintiff Rogers Group, Inc.'s ("Rogers Group") Motion for Preliminary Injunction [Doc. 9] hereby states as follows.

## INTRODUCTION

Almost five years ago, in February 2021, Mike Reed sold his rock quarry, asphalt and heavy construction business to Rogers Group (the "Transaction"). Mr. Reed largely retired and let others manage his remaining business—Reed Maintenance—which provided industrial waste management, dumpsters, portable toilets, and limited amounts of crushed rock to construction sites, all of which Plaintiff was aware both before and after the Transaction. In early 2025, Reed Maintenance began to seek opportunities to engage in additional hauling services as well as smaller construction projects. Mr. Reed, who had become more involved in overseeing Reed Maintenance and whose son-in-law Bryceton Flack he had transitioned to an operations role, consistently communicated with Rogers Group both in an effort to offer such hauling services to Rogers Group

and confirm that various projects being considered by Reed Maintenance would not be viewed by Rogers Group as a violation of Defendants' non-competition obligations and, therefore, as out of bounds. Reed Maintenance openly provided these new services and stayed in contact with Rogers Group.

Mr. Reed and Mr. Flack communicated with the trucking foreman at Rogers Group about its desire to provide lease hauling services. Independent companies with dump trucks will provide "lease hauling" services to general contractors to provide temporary assistance at any job site where needed. The general contractor directs the lease hauler as to what to haul, where to haul it, and what price will be paid for the hauling. Rogers Group indicated to Reed and Flack that it would use their services once they bought additional trucks and hired additional drivers. Reed Maintenance later agreed to provide the same lease hauling service to Grayson Carter and Sons ("Grayson Carter"), a heavy construction competitor of Rogers Group. Lease hauling does not implicate any use of confidential information belonging to Rogers Group nor constitute the "heavy construction" in which Mr. Reed and Reed Maintenance agreed not to perform in competition with Rogers Group.

Neither Mr. Reed nor anyone at Reed Maintenance received any indication of concern from anyone at Rogers Group regarding its lease hauling services provided to Grayson Carter (or any other contractors) or the limited construction projects in which it engaged or about which it expressed interest in performing to Rogers Group before the filing of this lawsuit. Rogers Group's allegations in its Complaint consist of pictures of Reed Maintenance trucks engaged in lease hauling services for Grayson Carter and speculation regarding Defendants' breach of the APA and associated documents without factual support. Mr. Reed is aware of rumors in the community that he has invested or is somehow involved in Grayson Carter's business beyond the lease hauling

services provided by Reed Maintenance. Given its failure to communicate with Mr. Reed and the thinness of its allegations in the Complaint, presumably Rogers Group has filed this lawsuit in order to obtain the use of the discovery process to explore that concern. Defendants flatly deny any such involvement in the business of Grayson Carter and breach of their restrictive covenants.

While Defendants oppose the entry of a preliminary injunction, the need for which Rogers Group has failed to adequately establish both with respect to the likelihood of success on its claims as well as the threat of irreparable harm in the absence of such extraordinary relief, Mr. Reed has no interest in any ongoing litigation with Rogers Group. In an attempt to expeditiously resolve this matter, Reed Maintenance has stopped all lease-hauling of limestone products and engaging in the provision of any other services beyond the waste services it has traditionally provided and the hauling of sand products for non-contractors. Reed Maintenance has laid off six truck drivers, as well as its estimator, and has shifted most of its small fleet of trucks to the waste hauling services at the Essity tissue plant in West Alabama, and is only hauling sandstone and sand products for non-contractors such as the Huntsville Waste Disposal Authority and a landscaping supply business. Defendants have voluntarily provided Plaintiff with the relief it seeks, communicated to Plaintiff that it has taken this action, and now respectfully request that the Court order the parties to engage in mediation before proceeding further with this lawsuit.

While Defendants oppose Plaintiff's Motion for Expedited Discovery, it is willing to confer with Plaintiff regarding providing prior to such mediation, subject to a mutually agreed upon protective order, the limited information needed by Plaintiff to satisfy itself that Defendants are not involved in the business of Grayson Carter. This litigation could have been avoided with a phone call to Mr. Reed.

## FACTUAL BACKGROUND

### I. Background of Reed and Purchase of Reed Contracting.

In 2021, Reed Contracting operated five asphalt plants and a rock quarry, engaged in heavy road building and civil construction, and had six paving crews, dirt crews, and pipe crews with a total of approximately 650 employees. *See* (Reed Decl. ¶ 4) (attached as **Exhibit A**). Mr. Reed sold substantially all of the assets of Reed Contracting to Rogers Group pursuant to a February 12, 2021 Asset Purchase Agreement ("APA"). (*Id.* at ¶ 6). Reed Contracting had been a long-time customer and business partner of Rogers Group, to the point where Rogers Group was the primary supplier of stone for three asphalt plants that Reed Contracting operated, one of which was on Rogers Group's property. (*Id.* at ¶ 7).

Under the APA, Rogers Group purchased the "Business" of Reed Contracting, as well as substantially all of the assets owned by Reed Contracting and related Reed entities used in the operation of the "Business." (*Id.* at ¶ 8). Notably, the "Business" of Reed Contracting was defined in the APA as "the business of (a) mining and quarrying stone, rock, gravel and aggregates (including sand), and other miscellaneous materials, (b) providing heavy construction services (including grading, site preparation, road construction and underground utility construction and installation), and (c) producing, selling and installing asphalt and paving products, and providing related services." [Doc. 10-1].

In Section 5.5 of the APA, Reed Contracting and Reed Maintenance agreed, for a period of five years within Alabama and Tennessee, not to directly or indirectly: "(i) compete or plan to compete with [Rogers Group] in the Business; (ii) participate in the ownership, management, financing or control of, or act as an employee, advisor, consultant or agent to, or furnish services, information or advice to, whether or not for consideration, a Person that competes or plans to compete with [Rogers Group] in the business; or (iii) take or encourage an action the purpose or

effect of which is to evade the intent" of the non-compete provision. (Reed Decl. ¶ 9). Those same entities agreed not to disparage Rogers Group and not to solicit or hire any employee of Rogers Group, encourage or induce "an employee, agent, independent contractor, customer, supplier, or creditor" who had a business relationship with Rogers Group to "cease or adversely change its business relationship or dealings," or "deliberately interfere" with the relationship between Rogers Group and "an employee, agent, independent contractor, customer, supplier or creditor." (*Id.*).

One month after the execution of the APA, Mr. Reed entered into a Noncompetition Agreement, individually, with Rogers Group wherein he agreed for a period of five years to not "directly or indirectly . . . (1) compete or plan to compete with [Rogers Group] in the Business, (2) participate in in the ownership, management, financing or control of, or act as an employee, advisor, consultant or agent to, or furnish services, information or advice to, whether or not for consideration, a Person that competes or plans to compete with [Rogers Group] in the Business, or (3) take or encourage an action the purpose or effect of which is to evade the intent of [the non-competition provision]." (*Id.* at ¶ 10). The Noncompetition Agreement included non-solicitation and non-disparagement provisions similar to those in the APA. (*Id.* at ¶ 11). Additionally, the definition of "Business" in the Noncompetition Agreement is the same as set forth in the APA, and the geographic scope of the restrictive covenants was also defined to include Alabama and Tennessee. (*Id.*).[1]

_____

[1] Mr. Reed also entered into a Consulting Agreement with Rogers Group on March 8, 2021. (*Id.* at ¶ 12). However, Mr. Reed was not called or requested by Rogers Group at any time to consult on any project or strategy, or fulfill any obligations pursuant to the Consulting Agreement. (*Id.*). Mr. Reed specifically disputes the allegation in Paragraph 70 of the Complaint that he met "with Rogers Group employees to discuss their strategies for developing business" or "reviewed and provided feedback to Rogers Group on a significant construction project for which Rogers Group was submitting a bid." [Doc. 1 ¶ 70]; *see* (Reed Decl. ¶ 13).

## II.     The Limited Work Performed by Reed Maintenance.

After the execution of the APA, Mr. Reed retained ownership of Reed Maintenance[2], although Mr. Reed bought a farm and generally was not involved in the day-to-day operation of Reed Maintenance until late 2024/early 2025 when Mr. Reed received some feedback about significant client dissatisfaction at the Essity tissue plant and Reed Maintenance's Human Resources Director of many years had resigned. (*Id.* at ¶ 16). Mr. Reed reengaged in overseeing the business and transitioned his son-in-law, Bryceton Flack (a Reed Maintenance salesman), into an operations position.  (*Id.*). Before and after the Transaction, Reed Maintenance has provided dumpsters and portable toilets to construction sites, and also hauled small amounts of crushed rock to those same sites (much of which was purchased from Rogers Group). (*Id.* at ¶ 17). Reed Maintenance has also provided approximately 20 "roll-off" dumpsters and 25 portable toilets monthly to Rogers Group from 2021 to the present. (*Id.*). Additionally, before and after 2021, Reed Maintenance has hauled "sludge" at several papermills, including at the Essity tissue plant located in Barton, Alabama, the Courtland, Alabama paper mill, and a West-Rock papermill in Stevenson, Alabama (although Reed Maintenance later lost its contract to perform this work in November 2022). (Reed Decl. ¶ 18); *see also* (Flack Decl. ¶ 5) (attached as **Exhibit B**). The waste services and hauling performed by Reed Maintenance are clearly not within the definition of Business set

---

[2] After executing the APA, Reed Contracting was required to change its name (which it chose to do to Reed Alabama), as Rogers Group had purchased the company name pursuant to Section 1.1(xvii). (*Id.* at ¶ 14). Rogers Group, inexplicably, claims this name change was an "effort to obscure the entity's unlawful competition" with Rogers Group as alleged in Paragraph 45 of the Complaint. [Doc. 1 ¶ 45]. Reed Alabama is simply a holding company that manages certain assets received by Defendants as a result of the APA and has provided some financing for Reed Maintenance. (Reed Decl. ¶ 15).

forth in the APA and not covered by the restrictive covenants at issue nor challenged by Rogers Group in the Complaint.[3]

### III. Lease Hauling Work at Issue in the Complaint.

As Plaintiff is aware, Reed Maintenance has a long-standing relationship with the Huntsville Solid Waste Disposal Authority pre-dating the Transaction. (Reed Decl. ¶ 20). Reed Maintenance has provided equipment operators and laborers to be present at the municipal landfill on a daily basis. (*Id.*). Reed Maintenance also hauls daily to the landfill over ten loads of steam plant ash, as well as waste associated with its portable dumpster business. (*Id.*).

In February 2025, the Huntsville Solid Waste Disposal Authority contacted Reed Maintenance to request a bid for waste transfer services at the municipal landfill for the City of Huntsville. The project was described as excavation and relocation of waste within the cells of the landfill. (Reed Decl. ¶ 21; Flack Decl. ¶ 7). However, before submitting a bid, Mr. Reed called Scott Cornelius, a Sales Manager for Rogers Group (with whom he had a long-standing relationship) to obtain the contact information for Jimmy Patton, Rogers Group's current President and CEO. (Reed Decl. ¶ 22). Mr. Patton later called Mr. Reed, and Mr. Reed asked him if Rogers Group had any issue with Reed Maintenance placing a bid for the landfill project. (*Id.*). After checking on the matter, Mr. Patton called Mr. Reed back and said that Rogers Group did not plan to bid on the project, and there would be no issue with Reed Maintenance placing a bid. (*Id.*). However, shortly after, the bidding process was cancelled by the Huntsville Solid Waste Disposal

---

[3] While at one point Reed Maintenance's website included a general reference to "site work" as being among the services that Reed Maintenance could provide, this listing was in error, as Reed Maintenance's new Human Resources Director uploaded the website without general direction or approval of the work that the company could perform. After Mr. Reed learned of the website's description of the work that Reed Maintenance performed, he immediately instructed that this portion be removed. (Reed Decl. ¶ 19).

Authority for the project, and Reed Maintenance did not submit a bid. (Reed Decl. ¶ 23; Flack Decl. ¶ 7). Reed Maintenance did however obtain a primary contract in March 2025 from the Huntsville Solid Waste Disposal Authority for lease hauling sandstone material to the municipal landfill for the City of Huntsville.[4] (Reed Decl. ¶ 24; Flack Decl. ¶ 8).

Reed Maintenance decided to attempt to expand its hauling operations, and reached out to Rogers Group. In approximately February 2025, Mr. Reed met with the trucking foreman for Rogers Group, Bobby Sims. (Reed Decl. ¶ 25). Mr. Reed told Mr. Sims that Reed Maintenance was interested in lease hauling for Rogers Group and would purchase additional trucks to provide that service, and Mr. Sims stated that Rogers Group would utilize Reed Maintenance as a lease hauler on its projects should Reed Maintenance obtain the trucks. (*Id.*). Mr. Reed and Mr. Flack both called Mr. Sims after purchasing the additional trucks, and Mr. Flack had an in-person conversation with Mr. Sims where Matt Farley, Rogers Group's Trucking Supervisor, was also present. (Reed Decl. ¶ 25; Flack Decl. ¶ 10). Mr. Sims consistently reiterated that Rogers Group would utilize Reed Maintenance's drivers and trucks. (*Id.*).

Lease-hauling is common in the construction industry, particularly involving crushed rock and site preparation, as independent companies with dump trucks will work with general contractors to provide temporary assistance at any job site where needed. (Reed Decl. ¶ 26; Flack Decl. ¶ 11). Drivers are told to be at a quarry or jobsite at a certain time, and will haul dirt or other material to a specified location. (*Id.*). There are no set contracts, and the work is performed day-to-day, depending on the needs of the general contractor. (*Id.*). The company providing trucks as

---

[4] Mr. Reed sold to Rogers Group a sand pit as part of the Transaction, but Rogers Group subsequently sold that sand pit and discontinued providing sand-based products such as sandstone. (Reed Decl. ¶ 24).

a lease-hauler does not dictate prices, as there is an established rate for such work in the Huntsville area. (*Id.*).

However, after Reed Maintenance purchased additional trucks and hired additional drivers, Mr. Sims never contacted Mr. Reed or Mr. Flack about Reed Maintenance performing any work for Rogers Group. (Reed Decl. ¶ 25; Flack Decl. ¶ 10). Reed Maintenance subsequently was contacted on or about March 2025 about performing lease-hauling work for Grayson Carter and Son Contractor ("Grayson Carter"), another general contractor in the construction industry in the North Alabama area. (Reed Decl. ¶ 27; Flack Decl. ¶ 12).

Mr. Reed was unaware of any concern by Rogers Group that providing lease hauling services to Grayson Carter or any other construction company would be considered a breach of any restrictive covenant by Reed Maintenance or Mr. Reed. (Reed Decl. ¶ 28). Companies like Grayson Carter and Rogers Group utilize lease-haulers to manage the day-to-day fluctuations of a contractor's need for trucks during a construction project. (Reed Decl. ¶ 29). In fact, several companies regularly contract with <u>both</u> Rogers Group and Grayson Carter to lease their trucks and drivers to support various projects. (*Id.*). Reed Maintenance is aware of at least fifteen companies that regularly work as a lease hauler for both Rogers Group and Grayson Carter, even on the same day. (*Id.*). Therefore, in an effort to utilize trucks that were not being used, Reed Maintenance agreed to work as a lease hauler for Grayson Carter on several occasions. (Reed Decl. ¶ 30).

Ultimately, several of the challenged allegations in the Complaint simply involve lease hauling work that Reed Maintenance performed for Grayson Carter. For example, Rogers Group claims that Mr. Reed has been actively competing with Rogers Group through work at the Abbey Brook subdivision, a residential subdivision development in Athens, Alabama. [Doc. 1 ¶ 46-47]. Rogers Group cites pictures of dump trucks owned by Reed Maintenance transporting gravel to

the Abbey Brook construction site. [*Id.* at ¶ 48-52]. However, this was simply work that Reed Maintenance performed as a lease-hauler for Grayson Carter. (Reed Decl. ¶ 31). Similarly, Reed Maintenance's delivery to a paving project for a new Marriot hotel, as alleged in Paragraphs 55-57 of the Complaint, was actually lease hauling asphalt millings away from the project site for Grayson Carter. [Doc. 1 ¶ 55-57]. (Reed Decl. ¶ 31). The same is true for the night-time hauling services alleged in Paragraph 59 of the Complaint, as well as work Reed Maintenance performed at the Redstone Arsenal, as alleged in Paragraph 61 of the Complaint. *See* [*Id.* at ¶¶ 59, 61]. (Reed Decl. ¶ 31).

## IV. Reed's Regular Interaction with Rogers Group and Rogers Group's Awareness of Reed Maintenance's Business Activities.

Reed Maintenance, Reed Alabama, and Mr. Reed have not engaged in the mining and quarrying of stone, rock, gravel, or aggregates since February 2021. (Reed Decl. ¶ 32). With respect to engaging in any construction project that could be considered part of the Business sold to Rogers Group, Mike Reed understood that if he received confirmation that Rogers Group was not interested in performing such project, that Reed Maintenance could begin to take on such work. (Reed Decl. ¶ 32). If Reed Maintenance was interested in performing any work that it thought could be part of the work sold to Rogers Group, it would check with Rogers Group before Reed Maintenance pursued such work. (Reed Decl. ¶ 33). As stated above, Mr. Reed called Mr. Patton immediately after learning of the work waste transfer services at the Huntsville landfill in February 2025. (Reed Decl. ¶ 22). Neither Mr. Reed nor Reed Maintenance has attempted to hide anything from Rogers Group.

In May 2025, Reed Maintenance received a call from Limestone Building Group about performing site work for a proposed library and local community center. (*Id.* at ¶ 34). Mr. Reed called Dale Kinney, Rogers Group's head estimator in Huntsville, to tell him that Reed

Maintenance had received a call about the project. (*Id.*). Mr. Kinney told Mr. Reed that Rogers Group was considering bidding on the project, and as a result, Reed Maintenance did not pursue the opportunity. (*Id.*).

Rogers Group claims that "both Rogers Group and Reed Maintenance planned to submit competing bids for a roadway paving project with the City of Arab," that Reed Maintenance stated that it "was no longer submitting a bid," and that Reed Maintenance allegedly "had an agreement" with a competitor "to submit a bid in [Reed Maintenance's] place." [Doc. 1 ¶ 60]. Nick Pettit, an estimator for Reed Maintenance, saw the posting for the job for the City of Arab less than a week before bids were due, and considered placing a bid when he believed that at the time no one was bidding for the work. (Reed Decl. ¶ 43). However, Mr. Pettit learned later that week that Rogers Group planned to submit a bid, and he stopped any efforts to submit a bid on behalf of Reed Maintenance based on Mr. Reed's prior instruction to him, and other Reed Maintenance employees, that Reed Maintenance would not compete with Rogers Group. (*Id.*). Prior to learning that Rogers Group was submitting a bid for the project, Reed Maintenance reviewed drawing and started the planning process to determine whether it could submit a bid, including identification of a landowner near the project with a large supply of dirt, but which was not state certified as required for the project. (*Id.* at ¶ 44). Mr. Pettit did provide a potential quote to Grayson Carter for what Reed Maintenance would charge to haul this dirt; however, Reed Maintenance did not place a bid for the project. (*Id.*). Mr. Pettit then attended the bid selection process to see if he might provide dirt hauling services to whoever won the bid. (*Id.*).

Reed Maintenance regularly alerted Rogers Group of potential business opportunities. The operations manager of B&K Contracting told Mr. Flack in December 2024 that it had purchased crushed rock for a project at the Redstone Arsenal. (Flack Decl. ¶ 13). Mr. Reed and Mr. Flack

subsequently met with John Monroe, a Senior Sales Representative for Rogers Group in the Huntsville area, and asked if he was aware of the B&K project at Redstone Arsenal and he was not. Mr. Reed and Mr. Flack proposed that Reed Maintenance could buy rock from Rogers Group and haul it for such future projects that came to its attention—which would benefit both companies. (Reed Decl. ¶ 35; Flack Decl. ¶ 13). Mr. Monroe agreed and sent Mr. Flack quotes for rock pricing in December 2024 shortly after this meeting. (*Id.*). In or around May 2025, Mr. Monroe and his supervisor contacted Mr. Reed and Mr. Flack and took them to lunch to discuss Reed Maintenance purchasing rock from Rogers Group if Reed Maintenance was approached about jobs to haul stone. (Reed Decl. ¶ 36; Flack Decl. ¶ 14). Mr. Monroe sent Mr. Flack an updated quote for rock pricing at that time. (*Id.*).

In July 2025, Mr. Flack called Mr. Monroe and told him that Reed Maintenance had been approached about hauling 4,000 tons of rock for two projects for Lee Builders (the Hobbs Island and Hazel Green High School projects). (Flack Decl. ¶ 15). Mr. Monroe provided an updated quote on July 17, 2025, and Reed Maintenance bought the rock for the project from Rogers Group on both occasions, even though there was another quarry closer to the Hazel Green project. (*Id.*).

Mr. Reed also continued to speak highly of the services that Rogers Group provided. Mr. Reed convinced Kenneth Maze, a personal friend and contractor for a subdivision in Arab, Alabama, to use Rogers Group to perform the paving for a project (the Highlands Property), despite another company offering a cheaper price on paving. (Reed Decl. ¶ 37). Mr. Maze subsequently used Rogers Group for paving work on this subdivision property in March 2023 and January 2024, as well as for another property in July 2025. (*Id.*).

These communications highlight the regular communications and transparency that Reed Maintenance and Mr. Reed attempted to have with Rogers Group during this time. When Reed

Maintenance built a new office, the company hired Rogers Group to pave the parking lot in April 2024, a job worth over $100,000.00. (Reed Decl. ¶ 39). As detailed above, whenever Mr. Reed heard about potential purchases of large supply of crushed rock, he contacted Rogers Group to see if Rogers Group was interested in these jobs and if Reed Maintenance could perform the hauling work. Moreover, Reed Maintenance regularly bought crushed rock from Rogers Group during this time for its residential homebuilder clients. (*Id.*). In fact, in September 2025, weeks before the present lawsuit was filed, Mr. Reed had lunch with Scott Cornelius, an Acquisitions Manager for Rogers Group, who did not raise any issues about the work that Reed Maintenance was performing. (*Id.* at ¶ 40).

## V.    Rogers Group's Further Speculation as to Breaches by Defendants of the Restrictive Covenants.

Much of what Rogers Group alleges in its Complaint is simply speculation. First, Rogers Group sets forth in the Complaint that Reed Maintenance "recently registered to become a 'prequalified prime contractor' with the Alabama Department of Transportation." [Doc. 1 ¶ 19]. However, Reed Maintenance did not register for such a qualification to perform any road construction jobs and has not bid on any such projects with the Alabama Department of Transportation ("Alabama DOT"). (Reed Decl. ¶ 41).   Reed Maintenance obtained this qualification in order to bid on demolition work for the Alabama DOT. (*Id.*). Within the waste services that Reed Maintenance provides, the Company has observed several customers rent construction dumpsters and then take on lucrative jobs performing demolition projects for small houses or commercial buildings. (*Id.*). This is work that Rogers Group has not performed and would clearly not be considered heavy construction services.

Next, Rogers Group speculates that Defendants must be engaged in the prohibited Business because Reed Maintenance was "delivering gravel . . . to two neighboring new home construction

sites." [Doc. 1 ¶ 53]. The only work that Reed Maintenance performed on these construction sites was delivering gravel. Reed Maintenance has been delivering to this neighborhood for Guild Homes for years, and for which it has regularly purchased crushed rock from Rogers Group. (Reed Decl. ¶ 42). Moreover, these are not large projects, as the deliveries are often simply two or three loads per month of crushed rock which is used under a porch or slab. (*Id.*).

Rogers Group similarly claims that "Reed Maintenance employees and equipment have recently performed other business in competition with Rogers Group at residential construction sites associated with D.R. Horton, Inc., Smith Douglas Homes, and Guild Builders." [Doc. 1 ¶ 63]. Again, Reed Maintenance has sold and hauled rock to Guild Builders, often purchased from Rogers Group, as detailed above. (Reed Decl. ¶ 45). Any work performed for DR Horton or Smith Douglas was lease hauling work performed for Grayson Carter.[5] (*Id.*).

Regarding the new gymnasium at Brindlee Mountain High School, Mr. Flack, along with Mr. Reed's children, were alumni of this local school located three miles from the Reed Maintenance corporate office in Union Grove which is where the Reeds live. (Reed Decl. ¶ 47; Flack Decl. ¶ 17). Mr. Reed has regularly donated money to the school. (Reed Decl. ¶ 47). In August 2025, Mr. Flack asked Mr. Pettit to submit a bid for the site work for the building of a new gymnasium after receiving public notice that bids were being received. (Flack Decl. ¶ 18). This was a relatively small project and Mr. Flack was unaware that Rogers Group was bidding on the project. (*Id.*). Mr. Reed had no knowledge of Reed Maintenance submitting a bid, and Reed Maintenance's bid was not accepted. (Reed Decl. ¶ 48). After the contract was awarded, Reed

---

[5] Additionally, Reed Alabama and Reed Maintenance do not have a truck with the number 441, as alleged in the Complaint. (Reed Decl. ¶ 46).

Maintenance did offer to provide dumpsters and portable restrooms for the general contractor that won the bid for the Brindlee Mountain High School job. (Reed Decl. ¶ 49).

## VI.     Reed and Reed Maintenance Did Not Solicit Any Rogers Group Clients or Employees or Improperly Utilize Confidential Information.

Rogers Group alleges, with no support, that "Defendants have recently solicited current Rogers Group employee truck drivers, in at least some instances using recruiters to disguise their prohibited solicitations." [Doc. 1 ¶ 64]. This is patently untrue. Defendants have not attempted to hire any Rogers Group employee—other than Mr. Pettit, for whom Reed Maintenance was explicitly granted permission by Rogers Group. (Reed Decl. ¶ 50; Flack Decl. ¶ 19).

Mr. Pettit had previously worked for Reed Contracting for approximately fifteen years as an estimator before leaving to work for Rogers Group after the Transaction in March 2021. (Reed Decl. ¶ 51). After he was laid off by Rogers Group, Mr. Reed called Tim Gorman, an Area Manager for Rogers Group, to ask if Rogers Group had any issue with Reed Maintenance hiring Mr. Pettit. (*Id.*). Mr. Gorman called Mr. Reed back that same day to let him know that Rogers Group had no issue with this hiring. (*Id.*).

Mr. Reed has gone above and beyond to emphasize that Reed Maintenance cannot hire former Rogers Group employees in any position, and the Company has not directly hired any employees (other than Mr. Pettit) from Rogers Group. (Reed Decl. ¶ 50). No Reed Maintenance employee has contacted a Rogers Group employee about a potential position (other than Mr. Pettit as discussed above). (*Id.*). Further, Reed Maintenance has not utilized a recruiter as alleged in Paragraph 64 of the Complaint. Reed Maintenance has posted positions on Indeed, but this is clearly not soliciting any Rogers Group employee. (Reed Decl. ¶ 52). Further, Reed Maintenance has declined to consider any resume of a Rogers Group employee received through Indeed. (*Id.*; Flack Decl. ¶ 19). Nor has Rogers Group identified any employee hired by Reed Maintenance.

Rogers Group further fails to identify any customers or suppliers which Reed is allegedly "actively soliciting" to "do business with Defendants rather than Rogers Group." [Doc. 1 ¶ 69]. Defendants deny these allegations, as they have only attempted to support the business operations of Rogers Group. Rogers Group also fails to allege any specific examples of Mr. Reed or any Reed Maintenance employee disparaging Rogers Group. Mr. Reed similarly denies these allegations and he has not disparaged the work of Rogers Group in any way. (Reed Decl. ¶ 57).

Rogers Group also claims, without any support, that Reed has "undermin[ed] Rogers Group in competitively bid projects and other projects where Rogers Group and Defendants compete for the same business." [Doc. 1 ¶ 66]. As detailed above, the only potential business of which Defendants are aware for which Rogers Group and Reed Maintenance both placed bids was the Brindlee Mountain High School project, and Reed Maintenance was not aware that Rogers Group had submitted a bid until the bids were submitted. (Flack Decl. ¶ 18).

Rogers Group also alleges, without any support in the Complaint, that "Defendants, directly or indirectly, have recently bid against Rogers Group on competitive projects with prices that appear only marginally higher—or even below—Defendants' own break-even point" and that Reed is "using confidential information of Reed Alabama . . . related to the production of aggregates and the pricing of products, services, and competitive bids to unlawfully compete with and take business away from Rogers Group." [Doc. 1 ¶¶ 67, 68]. This allegation similarly lacks any factual support. Not only has Reed Maintenance not competed with Rogers Group, but any confidential information sold to Plaintiff in 2021 is stale and outdated, and has no use in the present market. Pricing for labor and materials have drastically increased in the Huntsville Market over the past four years. (Reed Decl. ¶ 53). In addition to general cost increases brought upon by the COVID-19 pandemic, Smyrna Ready Mix has bought several concrete plants, while Rogers Group

has expanded construction operations. (*Id.*). This is in addition to at least four quarries opening in the Huntsville area and the sale of several other competing businesses. (*Id.*). The influx of several new companies in the Huntsville market, along with the general effect of the COVID-19 pandemic, has resulted in general increases in the price of labor and materials, as well as equipment. (*Id.*).

## VII.   Current Status of Reed Maintenance.

Defendants submit that any lease hauling work or other work that Reed Maintenance has performed was not in violation of any applicable restrictive covenant.  However, Mr. Reed has no interest in any ongoing litigation with Rogers Group.  Reed Maintenance has stopped all lease-hauling of limestone and asphalt products out of an abundance of caution and is not performing any construction services until this case concludes. (Reed Decl. ¶ 54; Flack Decl. ¶ 20). As a result, Reed Maintenance has laid off six truck drivers and its estimator Nick Pettit, shifted most of its trucks to the waste hauling services at the Essity tissue plant in West Alabama, and is only hauling sandstone and sand products for non-contractors such as the Huntsville Waste Disposal Authority and a landscaping supply business. Reed Maintenance has also stopped performing any work hauling for residential home builders. (*Id.*). Therefore, Reed Maintenance is only performing the services that it has since 2021—hauling of waste and the providing of waste services, along with hauling sand related products. Indeed, if Mr. Patton, Mr. Gorman, Mr. Sims or anyone else at Rogers Group had contacted Mike Reed before filing this lawsuit and voiced concern regarding the work being performed by Reed Maintenance, Mr. Reed would have taken the same action.

Defendants believe that the present suit was brought upon by rumors that Mr. Reed was investing in Grayson Carter. Defendants submit that these rumors are untrue. Mr. Reed was not involved in arranging work with Grayson Carter and has no involvement with the business of Grayson Carter. (Reed Decl. ¶¶ 55-56).  Mr. Reed has not even had any conversation with any

Grayson Carter employee or representative about the lease hauling work that Reed Maintenance has performed. (*Id.*). Reed Maintenance and Mr. Reed do not have any business relationship with Grayson Carter other than the limited times that Reed Maintenance's drivers have served as a lease hauler or waste management provider. (*Id.*). Defendants have no record of, no intention of, and no interest in, working with Grayson Carter or otherwise competing with Rogers Group in the Business, soliciting its employees or customers, or disparaging Rogers Group in any manner.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be had." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

In determining whether to grant a preliminary injunction or temporary restraining order, the court must consider four factors: (1) whether the moving party demonstrates a "strong" likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury if the injunction is not granted; (3) whether substantial harm to others will result if the injunction is granted; and (4) whether the public interest will be served by the issuance of a preliminary injunction. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573. "The party seeking a preliminary injunction bears a burden of justifying such relief, including showing irreparable harm and likelihood of success." *Kentucky v.U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014).

A plaintiff seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g., Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012); *United States v. Certain Land Situated in City of Detroit*, 1996 WL 26915, *1 n.1 (6th Cir. 1996) (noting a lack of evidence to support speculative allegations). The decision to issue a preliminary injunction is "within the discretion of the court." *Id.* (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

## ARGUMENT

## I.     Plaintiff is Not Likely to Succeed on the Merits of Its Underlying Contract Claims.

To establish likelihood of success on its breach of contract claims, Plaintiff relies on: a) pictures of Reed Maintenance trucks engaged in lease hauling for Grayson Carter; b) completely unsupported claims of use of Confidential Information that Defendants sold to Plaintiff 4.5 years ago; c) completely unsupported claims of solicitation by Defendants of Plaintiff's customers and suppliers not to do business with Plaintiff; d) completely unsupported claims of disparagement of Plaintiff by Defendants; and e) the (unsuccessful) bid submitted by Reed Maintenance (without Mike Reed's knowledge) on the Brindlee Mountain High School project in the small community in which Mr. Reed lives regarding which Defendants were unaware of any interest by Rogers Group.

The dearth of any factually supported allegation of breach of contract by Defendants, particularly against the actual background facts set forth above, make clear that Plaintiff cannot establish the requisite likelihood of success necessary to obtain preliminary injunctive relief. Lease hauling is not engaging in the business of heavy construction. Further, Mike Reed was in

constant communication with Rogers Group management (including its CEO): a) to avoid any issue regarding hiring its former employees or bidding in competition on projects; b) to offer to provide the same lease hauling services to Rogers Group; and c) to scout for opportunities to haul rock which Reed Maintenance would acquire from Rogers Group. Further, Mike Reed specifically encouraged contractors to hire and use Rogers Group for paving projects. And not once did Rogers Group ever voice any concern to Defendants regarding their conduct before filing this lawsuit.

Specifically, Rogers Group claims that it can establish a reasonable likelihood of success on the merits based on Defendants' alleged unlawful competition of "providing services related to asphalt and paving products in the construction of the Abbey Brooke subdivision . . . the Bishop Road residential construction sites . . . the Marriott hotel construction site . . . and a north Alabama highway paving project." [Doc. 10 p. 14].[6] Such allegations demonstrate that Rogers Group relies largely upon work that Reed Maintenance performed simply as lease haulers for Grayson Carter, specifically with respect to the allegations related to the Abbey Brooke subdivision, the Marriott hotel construction sites, and the night-time hauling services alleged in Paragraph 59 of the Complaint. Moreover, Reed Maintenance expanded its lease hauling services only after speaking with Mr. Sims, a Rogers Group employee, and being informed that Rogers Group would hire Reed Maintenance as a lease hauler. The only work that Reed Maintenance performed for the Bishop Road residential construction site was delivering gravel. Reed Maintenance regularly purchased crushed rock from Rogers Group for such projects, and Defendants submit that such work was not in violation of the Noncompetition Agreement.

---

[6] Defendants have generally responded to these allegations, as the citations in the Complaint which Plaintiff relies upon in its supporting Memorandum are incorrect. *See* [Doc. 10 p. 14].

Similarly, Rogers Group asserts that Defendants "have actively competed with Rogers Group" by "providing 'asphalt and paving products' and services related to asphalt and paving." [Doc. 10 p. 15].  Again, the work that Reed Maintenance performed was simply lease hauling, and not the providing of asphalt or paving products, and does not constitute engaging in the prohibited "Business."  Plaintiff made no attempt to determine the actual work that Reed Maintenance provided on these projects.

Finally, Rogers Group cites to the bid that Reed Maintenance submitted for the new gymnasium at the Brindlee Mountain High School. Mr. Reed had no knowledge of the bid that was submitted by Reed Maintenance at the School, and Reed Maintenance's bid was not accepted. (Reed Decl. ¶ 48). Mr. Flack was not aware that Rogers Group had also submitted a bid, and Mr. Reed certainly would have instructed Mr. Flack not to submit a bid if he was aware of the circumstances. (Flack Decl. ¶ 18).  The Brindlee Mountain High School gym is a small project in a small community in Mike Reed's backyard where his kids went to school and no one at Reed Maintenance anticipated that Rogers Group would have any interest in such a project.

## II.    Plaintiff Will Not Suffer Irreparable Harm if the Preliminary Injunction is Not Granted.

Rogers Group is unable to establish "the existence of an irreparable injury," which is "mandatory" for injunctive relief to be granted. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). "[A] district court is 'well within its province' when it denies a preliminary injunction based solely on the lack of an irreparable injury." *Id.* (citing *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* at 327 (citing *Michigan. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). "A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at

law." *N. California. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 105 S. Ct. 459, 459, 83 L. Ed. 2d 388 (1984). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

At the outset, Rogers Group cannot demonstrate irreparable harm when Reed Maintenance has stated that it has ceased all lease-hauling of limestone and asphalt products out of an abundance of caution (including any lease-hauling for Grayson Carter) and is not performing any construction services until this case concludes. (Reed Decl. ¶ 54). As this Court has held, "[d]efendants' voluntary cessation is pertinent, however, to the Court's ruling on the instant Motion because '[c]essation of the allegedly illegal conduct, though not rendering a claim moot, nevertheless may affect the ability to obtain injunctive relief, as by impacting the ability to show substantial and irreparable injury.'" *Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, No. 3:23-CV-00211, 2024 WL 112839, at *7 (M.D. Tenn. Jan. 10, 2024) (Richardson, J.), *aff'd sub nom. Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, No. 24-5056, 2025 WL 2599923 (6th Cir. Sept. 9, 2025) (internal quotations omitted).

While Defendants are not claiming that such voluntary cessation for a temporary period renders Plaintiff's Motion moot, it does highlight the lack of irreparable injury that Rogers Group is currently facing. This is especially true when combined with the limited nature of the work that that Reed Maintenance actually performed, when contrasted with Plaintiff's lack of factual support for its allegations that Defendants were engaged in the Business. Plaintiff's Complaint fails to allege any business opportunities that it lost to Reed Maintenance. Presumably Plaintiff is not claiming that providing lease hauling services damaged Plaintiff in some fashion, particularly when those same services were offered to Plaintiff.

Any allegations as to the loss of customer goodwill are merely speculative, particularly where Mr. Reed and Reed Maintenance regularly purchased rock from Rogers Group, referred business opportunities to Rogers Group, and were regularly in contact with high-ranking employees about the work that Reed Maintenance was performing without objection. *See, e.g.*, *Legacy Roofing Servs. LLC v. Fusco*, 710 F. Supp. 3d 553, 574 (N.D. Ohio 2024) (finding plaintiff could not demonstrate irreparable harm where it had not established that it "will lose goodwill or customers without a preliminary injunction," any confidential information had become stale, and the plaintiff would only be "harmed if it loses business to [the defendant]. If Legacy loses a bid to a third-party competitor, the cause of that lease is neither trade secret misappropriation nor breach of Fusco's non-solicitation clause"). While Plaintiff relies upon *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993), in *AmeriGas*, the plaintiff had lost over 100 actual customers to the defendants. Plaintiff has not identified a single customer it lost to Defendants. Plaintiff's allegations that "Defendants [have] taken business opportunities from Rogers Group" or that Defendants improperly solicited any Rogers Group customers are completely without any factual support. [Doc. 10 p. 16]. Further, Defendants' cessation of the activities that Plaintiff wrongly alleges were in violation of the Noncompetition Agreement eradicates Plaintiff's ability to demonstrate irreparable harm, and thus negates the necessary harm for a preliminary injunction.

### III.     The Balance of Harm Does not Weigh in Plaintiff's Favor.

Defendants have already voluntarily ceased doing the portion of business about which Plaintiff makes unsupported allegations of breach of contract until this case can be resolved. Defendants are the only parties being harmed and that without entry of the preliminary injunction. What is also troubling is that Plaintiff's Motion [Doc. 9] does not detail the specific form of injunctive relief that it has requested.   Defendants would certainly submit that any injunction

requiring Defendants to further restrict their business beyond the borders to which they have already voluntarily limited their conduct would exceed any possible bounds of the restrictive covenants at issue and would severely harm Defendants.

## IV. The Public Interest Will Not Be Harmed if a Preliminary Injunction is Not Granted.

The public's interest will not be harmed here if a preliminary injunction is not granted, even if the public has an interest in parties abiding by contractual obligations. First, as stated above, Defendants are abiding and have abided by their contractual obligations, so the public interest is being furthered. Second, Defendants have ceased the specific actions which Plaintiff alleges constituted unlawful competition, even though Plaintiff relies upon unsupported allegations and speculation. Lastly, even if Defendants' actions are in violation of their contractual agreements, which Defendants maintain they are not, competition is so strongly favored in Tennessee that a prohibition against "perpetuities and monopolies" is contained in the State Constitution. Tenn. Cons. Art. I § 22.

## V. Request to Refer Matter to Mediation.

Defendants request that this Court refer the matter to mediation pursuant to M.D. Tenn. Local Rule 16.02(b) in order for the parties to have the opportunity to resolve this case and avoid the unnecessary expense of protracted pretrial proceedings and potential trial. As stated throughout this Response, Plaintiff's Complaint includes several incorrect and unsupported factual allegations about the work that Reed Maintenance has actually performed. However, Reed Maintenance has voluntarily ceased this challenged work until this matter is resolved. Mike Reed believed that he had a beneficial relationship with Rogers Group grounded in mutual trust and respect. Despite the apparent deterioration in the relationship, based upon the prior longstanding relationship between

the parties, as well as the limited nature of the work at issue, Defendants submit that this matter should be properly resolved by mediation.

## CONCLUSION

For these reasons, Defendants respectfully requests that Plaintiff's motion for preliminary injunction be denied.

Dated this 5th day of November, 2025.

Respectfully submitted,

*/s/ Robert W. Horton*
Robert W. Horton (TN BPR# 017417)
James T. Snodgrass (TN BPR# 036212)
Hunter K. Yoches (TN BPR# 036267)
Bass, Berry & Sims PLC
21 Platform Way South, Suite 3500
Nashville, TN 37203
Telephone: (615) 742-6200
bhorton@bassberry.com
jimmy.snodgrass@bassberry.com
hunter.yoches@bassberry.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2025, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Cason M. Kirby*
HOLLAND & KNIGHT LLP
1901 Sixth Avenue North, Suite 1400
Birmingham, Alabama 35203
cason.kirby@hklaw.com
*Pro Hac Vice*
*Counsel for Plaintiff*

Paul S. Davidson
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
paul.davidson@hklaw.com
*Counsel for Plaintiff*

*/s/ Robert W. Horton*