# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ROGERS GROUP, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) CIVIL ACTION NO. 3:25-cv-1210 |
| MICHAEL REED, REED ALABAMA, INC., and REED MAINTENANCE SERVICES, INC., | ) District Judge Campbell ) ) ) ) |
| Defendants. | ) |

## DECLARATION OF MICHAEL REED

I, Michael Reed, having personal knowledge of the facts contained in this Declaration and being competent to testify to them, hereby state under oath as follows:

1. I am making this Declaration of my own free will and accord. I am over eighteen (18) years of age and am competent to make this Declaration.

2. I am the current owner of Reed Maintenance Services, Inc. ("Reed Maintenance"), as well as a partial owner, along with my wife, Connie Reed, of Reed Alabama, Inc. ("Reed Alabama"), which was formerly known as Reed Contracting, Inc. ("Reed Contracting").

3. I started Reed Contracting, Inc. in 1987, which grew to become a pre-eminent civil construction company in North Alabama that provided mass excavating, grading, underground utilities, asphalt paving and trucking services in and around the Huntsville area.

4. In February 2021, Reed Contracting operated five asphalt plants and a rock quarry, engaged in heavy road building and civil construction, and had six paving crews, dirt crews, and pipe crews (with a total of approximately 650 employees).

5. In addition to Reed Contracting, I and other family members owned and operated Reed Maintenance, Reed Leasing, LLC, and Reed Management and Equipment, Inc.

6. I sold substantially all of the assets of Reed Contracting to Rogers Group, Inc. ("Rogers Group") pursuant to a February 12, 2021 Asset Purchase Agreement ("APA").

7. Reed Contracting had been a long-time customer and business partner of Rogers Group, to the point where Rogers Group was the primary supplier of stone for three asphalt plants that Reed Contracting operated, one of which was on Rogers Group's property.

8. Under the APA, Rogers Group purchased the "Business" of Reed Contracting, as well as substantially all of the assets owned by Reed Contracting used in the operation of the "Business." Rogers Group also purchased certain assets of Reed Maintenance, Reed Leasing, LLC, Reed Management and Equipment, Inc., and Reeds', LLC, to facilitate Rogers Group's operation of the "Business."

9. In Section 5.5 of the APA, Reed Contracting, Reed Maintenance, and the other related entities agreed, for a period of five years within Alabama and Tennessee, not to directly or indirectly: "(i) compete or plan to compete with [Rogers Group] in the Business; (ii) participate in the ownership, management, financing or control of, or act as an employee, advisor, consultant or agent to, or furnish services, information or advice to, whether or not for consideration, a Person that competes or plans to compete with [Rogers Group] in the business; or (iii) take or encourage an action the purpose or effect of which is to evade the intent" of the non-compete provision. Reed Contracting, Reed Maintenance, and the other related entities agreed not to disparage Rogers Group and not to solicit or hire any employee of Rogers Group, encourage or induce "an employee, agent, independent contractor, customer, supplier, or creditor" who had a business relationship with Rogers Group to "cease or adversely change its business relationship or dealings," or "deliberately interfere" with the relationship between Rogers Group and "an employee, agent, independent contractor, customer, supplier or creditor."

10. One month after the execution of the APA, I entered into a Noncompetition Agreement, individually, with Rogers Group wherein I agreed for a period of five years to not "directly or indirectly . . . (1) compete or plan to compete with [Rogers Group] in the Business, (2) participate in in the ownership, management, financing or control of, or act as an employee, advisor, consultant or agent to, or furnish services, information or advice to, whether or not for consideration, a Person that competes or plans to compete with [Rogers Group] in the Business, or (3) take or encourage an action the purpose or effect of which is to evade the intent of [the non-competition provision]."

11. The Noncompetition Agreement included non-solicitation and non-disparagement provisions similar to those of the APA. Additionally, the definition of "Business" in the Noncompetition Agreement is the same as set forth in the APA, and the geographic scope of the restrictive covenants was also defined to include Alabama and Tennessee.

12. I also entered into a Consulting Agreement with Rogers Group on March 8, 2021. However, Rogers Group never contacted me about any consulting services under this Agreement. I was not called or requested by Rogers Group at any time to consult on any project or strategy, or fulfill any obligations pursuant to the Consulting Agreement.

13. I did not meet "with Rogers Group employees to discuss their strategies for developing business" or "review[ed] and provide[d] feedback to Rogers Group on a significant construction project for which Rogers Group was submitting a bid" as alleged in Paragraph 70 of the Complaint.

14. After executing the APA, Reed Contracting was required to change its name (which it chose to do to Reed Alabama), as Rogers Group had purchased the company name pursuant to Section 1.1(xvii).

15. Reed Alabama is simply a holding company that manages certain assets received as a result of the APA and has provided some financing for Reed Maintenance.

16. After the execution of the APA, I retained the ownership of Reed Maintenance, although I bought a farm and generally was not involved in the day-to-day operation of Reed Maintenance until late 2024/early 2025. I had received some feedback about significant client dissatisfaction at the Essity tissue plant and in the same time period my Human Resources Director of many years had resigned. I reengaged in overseeing the business and transitioned my son-in-law, Bryceton Flack (a Reed Maintenance salesman) into an operations position.

17. Before and after the execution of the APA, Reed Maintenance has provided dumpsters and portable toilets to construction sites, and also hauled small amounts of crushed rock to those same sites (much of which was purchased from Rogers Group). Reed Maintenance has also provided approximately 20 "roll-off" dumpsters and 25 portable toilets monthly to Rogers Group from 2021 to the present.

18. Additionally, before and after 2021, Reed Maintenance has hauled "sludge" at several papermills, including at the Essity tissue plant located in Barton, Alabama, the Courtland, Alabama paper mill, and a West-Rock papermill in Stevenson, Alabama (although Reed Maintenance later lost its contract to perform this work in November 2022).

19. While at one point Reed Maintenance's website included a general reference to "site work" as being among the services that Reed Maintenance could provide, this listing was in error, as Reed Maintenance's new Human Resources Director uploaded the website without general direction or approval of the work that the company could perform. After I learned of the website's description of the work that Reed Maintenance performed, I immediately instructed that this portion be removed.

20. Reed Maintenance has a long-standing relationship with the Huntsville Solid Waste Disposal Authority of which Rogers Group was aware. Reed Maintenance has provided equipment operators and laborers to be present at the municipal landfill on a daily basis. Reed Maintenance also hauls daily to the landfill over ten loads of steam plant ash, as well as waste associated with its portable dumpster business.

21. In February 2025, the Huntsville Solid Waste Disposal Authority contacted Reed Maintenance to request a bid for waste transfer services at the municipal landfill for the City of Huntsville. The project was described as excavation and relocation of waste within the cells of the landfill.

22. I called Scott Cornelius, a Sales Manager for Rogers Group (with whom I had a long-standing relationship) to obtain the contact information for Jimmy Patton, Rogers Group's current President and CEO. Mr. Patton later called me and I asked him if Rogers Group had any issue with Reed Maintenance placing a bid for the landfill project. After checking on the matter, Mr. Patton called me back and said that Rogers Group did not plan to bid on the project, and there would be no issue with Reed Maintenance placing a bid.

23. Shortly after, the bidding process was cancelled by the Huntsville Solid Waste Disposal Authority for the project, and Reed Maintenance did not submit a bid.

24. Reed Maintenance did however obtain a primary contract in March 2025 from the Huntsville Solid Waste Disposal Authority for lease hauling sandstone material to the municipal landfill for the City of Huntsville. I previously sold to Rogers Group a sand pit as part of the Transaction, but Rogers Group subsequently sold that sand pit and discontinued providing sand-based products such as sandstone.

25. Reed Maintenance decided to attempt to expand its hauling operations. In approximately February 2025, I met with the trucking foreman for Rogers Group, Bobby Sims. I told Mr. Sims that Reed Maintenance was interested in lease hauling for Rogers Group and would purchase additional trucks to provide that service, and Mr. Sims stated that Rogers Group would utilize Reed Maintenance as a lease hauler on its projects should Reed Maintenance obtain the trucks. I called Mr. Sims after purchasing the trucks to tell him that Reed Maintenance was ready to begin lease-hauling for Rogers Group. Despite saying that Rogers Group could use the additional trucks, Mr. Sims never contacted me again about Reed Maintenance performing any lease hauling work for Rogers Group.

26. Lease-hauling is common in the construction industry, particularly involving crushed rock and site preparation, as independent companies with dump trucks will work with general contractors to provide temporary assistance at any job site where needed. Drivers are told to be at a quarry or jobsite at a certain time, and will haul dirt or other material to a specified location. There are no set contracts, and the work is performed day-to-day, depending on the needs of the general contractor. The company providing trucks as a lease-hauler does not dictate prices, as there is an established rate for such work in the Huntsville area.

27. Reed Maintenance was contacted on or about March 2025 about performing lease-hauling work for Grayson Carter and Son Contractor ("Grayson Carter"), another general contractor in the construction industry in the North Alabama area.

28. I was unaware of any concern by Rogers Group that providing lease hauling services to Grayson Carter or any other construction company would be considered a breach of any restrictive covenant by Rogers Group.

29. Companies like Grayson Carter and Rogers Group utilize lease-haulers to manage the day-to-day fluctuations of a contractor's need for trucks during a construction project. In fact, several companies regularly contract with <u>both</u> Rogers Group and Grayson Carter to lease their trucks and drivers to support various projects. I am aware of at least fifteen companies that regularly work as a lease hauler for both Rogers Group and Grayson Carter, occasionally on the same day.

30. In an effort to utilize trucks that were not being used, Reed Maintenance agreed to work as a lease hauler for Grayson Carter on several occasions.

31. Several of the challenged allegations in the Complaint simply involve lease hauling work that Reed Maintenance performed for Grayson Carter. These include allegations related to the transportation of gravel to the Abbey Brook subdivision, as alleged in Paragraph 46-52 of the Complaint. Reed Maintenance's delivery to a paving project for a new Marriot hotel, as alleged in Paragraphs 55-57 of the Complaint, was actually lease hauling asphalt millings away from the project site for Grayson Carter. The same is true for the night-time hauling services alleged in Paragraph 59 of the Complaint, as well as work Reed Maintenance performed at the Redstone Arsenal, as alleged in Paragraph 61 of the Complaint.

32. Reed Maintenance and Reed Alabama have not engaged in the mining and quarrying of stone, rock, gravel, or aggregates since February 2021. In 2025, Reed Maintenance began to consider smaller construction projects that could be considered part of the "Business" sold to Rogers Group. I understood that if I received confirmation that Rogers Group was not interested in performing any particular project, that Reed Maintenance could consider taking on such a project.

7

33. If Reed Maintenance was interested in performing any work that it thought could be part of the Business sold to Rogers Group, I would check with Rogers Group before Reed Maintenance pursued such work.

34. In May 2025, Reed Maintenance received a call from Limestone Building Group about performing site work for a proposed library and local community center. I called Dale Kinney, Rogers Group's head estimator in Huntsville, to tell him that Reed Maintenance had received a call about the project. Mr. Kinney told me that Rogers Group was considering bidding on the project, and as a result, Reed Maintenance did not pursue the opportunity.

35. In December 2024, Mr. Flack told me that the operations manager of B&K Contracting had told him that it had purchased crushed rock for a project at the Redstone Arsenal. Mr. Flack and I subsequently met with John Monroe, a Senior Sales Representative for Rogers Group in the Huntsville area, and asked if he was aware of such project (and he was not). We proposed that Reed Maintenance could buy rock from Rogers Group and haul it for such future projects that came to our attention—which would benefit both companies. Mr. Monroe agreed and sent Mr. Flack quotes for rock pricing in December 2024 shortly after this meeting.

36. In or around May 2025, Mr. Monroe and his supervisor contacted Mr. Flack and I and took us to lunch to discuss Reed Maintenance purchasing rock from Rogers Group if Reed Maintenance was approached about jobs to haul stone. Mr. Monroe sent Mr. Flack an updated quote for rock pricing at that time.

37. I also continued to speak highly of the services that Rogers Group provided. In particular, I convinced Kenneth Maze, a personal friend and contractor for a subdivision in Arab, Alabama, to use Rogers Group to perform the paving for a project (the Highlands Property), despite another company offering him a cheaper price on paving. Mr. Maze subsequently used

8

Rogers Group for paving work on this subdivision property in March 2023 and January 2024, as well as for another property in July 2025.

38. Whenever I heard about potential purchases of large supply of crushed rock, I contacted Rogers Group to see if Rogers Group was interested in these jobs and if Reed Maintenance could perform the hauling work.

39. When Reed Maintenance built a new office, the company hired Rogers Group to pave the parking lot in April 2024, a job worth over $100,000.00. Additionally, Reed Maintenance regularly bought crushed rock from Rogers Group during this time for its residential homebuilder clients.

40. In September 2025, weeks before the present lawsuit was filed, I had lunch with Scott Cornelius, an Acquisitions Manager for Rogers Group, who did not raise any issues about the work that Reed Maintenance was performing.

41. Rogers Group alleges in the Complaint that Reed Maintenance "recently registered to become a 'prequalified prime contractor' with the Alabama Department of Transportation." [Doc. 1 ¶ 19]. Reed Maintenance did not register for a qualification to perform any road construction jobs and has not bid on any projects with the Alabama Department of Transportation ("Alabama DOT"). Reed Maintenance obtained this qualification in order to bid on demolition work for the Alabama DOT. Within the waste services that Reed Maintenance provides, the Company has observed several customers rent construction dumpsters and then take on lucrative jobs performing demolition projects for small houses or commercial buildings.

42. Rogers Group alleges in the Complaint that I have violated the Noncompetition Agreement by "delivering gravel . . . to two neighboring new home construction sites." The only work that Reed Maintenance performed on these construction sites was delivering gravel. Reed

9

Case 3:25-cv-01210    Document 18-1    Filed 11/05/25    Page 9 of 14 PageID #: 195

Maintenance has delivered to this neighborhood for Guild Homes for years, and for which it has regularly purchased crushed rock from Rogers Group. These are not large projects, as the deliveries are often simply two or three loads per month of crushed rock which is used under a porch or slab.

43. In its Complaint, Rogers Group also alleges a roadway paving project with the City of Arab violated the Noncompetition Agreement. Nick Pettit, an estimator for Reed Maintenance, saw the posting for the job for the City of Arab less than a week before bids were due and considered placing a bid for the work when he believed that at the time no one was bidding for the work. However, when Mr. Pettit learned that Rogers Group was planning on submitting a bid, he stopped any efforts to submit a bid on behalf of Reed Maintenance based on my previous instruction to him, and other Reed Maintenance employees, about not competing with Rogers Group.

44. Prior to learning that Rogers Group was submitting a bid for the project, Reed Maintenance reviewed drawing and started the planning process to determine whether it could submit a bid, including identification of a landowner near the project with a large supply of dirt, but which was not state certified as required for the project. Mr. Pettit did provide a potential quote to Grayson Carter for what Reed Maintenance would charge to haul this dirt; however, Reed Maintenance did not place a bid for the project. Mr. Pettit then attended the bid selection process to see if he might provide dirt hauling services to whoever won the bid.

45. Reed Maintenance has sold and hauled rock to Guild Builders, often purchased from Rogers Group. Any work performed for DR Horton or Smith Douglas was lease hauling work performed for Grayson Carter.

46. Reed Alabama and Reed Maintenance do not have a truck with the number 441, as alleged in the Complaint.

47. The Complaint also references a bid that Reed Maintenance submitted regarding work on a new gymnasium at Brindlee Mountain High School. I have an extremely close relationship with the local school and have regularly donated money when asked. Mr. Flack, along with my children, were alumni of this local school located approximately three miles from Reed Maintenance's corporate headquarters in Union Grove (pop. 76) where my family also lives.

48. I later learned that in August 2025, Mr. Flack asked Mr. Pettit to submit a bid for the site work for the building of a new gymnasium after receiving public notice that bids were being received. I had no knowledge of Reed Maintenance submitting a bid, and Reed Maintenance's bid was not accepted. I would have instructed Mr. Flack not to submit a bid if I was aware of the circumstances.

49. After the contract was awarded, Reed Maintenance did offer to provide dumpsters and portable restrooms for the general contractor that won the bid for the Brindlee Mountain High School job.

50. Reed Maintenance and Reed Alabama have not attempted to hire any Rogers Group employee—other than Mr. Pettit. I have emphasized that Reed Maintenance cannot hire former Rogers Group employees in any position, and the Company has not directly hired any employees (other than Mr. Pettit) from Rogers Group. I am not aware of any Reed Maintenance employee that has contacted a Rogers Group employee about a potential position (other than Mr. Pettit).

51. Mr. Pettit had previously worked for Reed Contracting for approximately fifteen years as an estimator before leaving to work for Rogers Group after the execution of the Transaction in March 2021. After he was laid off by Rogers Group, I called Tim Gorman, an Area Manager for Rogers Group, to ask if Rogers Group had any issue with Reed Maintenance hiring

11

Mr. Pettit. Mr. Gorman called me back that same day to let him know that Rogers Group had no issue with this hiring.

52. Reed Maintenance has not utilized a recruiter as alleged in Paragraph 64 of the Complaint. Reed Maintenance has posted positions on Indeed. Reed Maintenance has declined to consider any resume of a Rogers Group employee received through Indeed.

53. Pricing for labor and materials have drastically increased in the Huntsville Market over the past four years. In addition to general cost increases brought upon by the COVID-19 pandemic, Smyrna Ready Mix has bought several concrete plants, while Rogers Group has expanded construction operations. This is in addition to at least four quarries opening in the Huntsville area and the sale of several other competing businesses. The influx of several new companies in the Huntsville market, along with the general effect of the COVID-19 pandemic, has resulted in general increases in the price of labor and materials, as well as equipment

54. Reed Maintenance has stopped all lease-hauling of limestone and asphalt products out of an abundance of caution and is not performing any construction services until this case concludes. As a result, Reed Maintenance has laid off six truck drivers and its estimator Nick Pettit, has shifted most of its trucks to the waste hauling services at the Essity tissue plant in West Alabama, and is only hauling sandstone and sand products for non-contractors such as the Huntsville Waste Disposal Authority and a landscaping supply business. Reed Maintenance has also stopped performing any work hauling for residential home builders.

55. I have not had a conversation with any Grayson Carter employee or representatives about the lease hauling work that Reed Maintenance has performed.

12

Case 3:25-cv-01210   Document 18-1   Filed 11/05/25   Page 12 of 14 PageID #: 198

56. Reed Maintenance and I do not have any business relationship with Grayson Carter other than the limited times that Reed Maintenance's drivers have served as a lease hauler or waste management provider.

57. I have not made any disparaging comments about Rogers Group or the work that Rogers Group performs at any time after the execution of the APA and Noncompetition Agreement. I have also not solicited any clients of Rogers Group to do business with myself or Reed Maintenance, rather than Rogers Group.

58. I have not utilized any confidential information of Rogers Group after the execution of the APA and Noncompetition Agreement. I have not utilized any confidential information of Reed Contracting since the execution of the APA and Noncompetition Agreement, including any information related to the production of aggregates and the pricing of products, services, and competitive bids to attempt to take business away from Rogers Group.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing declaration is true and correct.

Dated this 5th day of November, 2025.

_____
Michael Reed

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2025, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Cason M. Kirby*
HOLLAND & KNIGHT LLP
1901 Sixth Avenue North, Suite 1400
Birmingham, Alabama 35203
cason.kirby@hklaw.com
*Pro Hac Vice*

Paul S. Davidson
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
paul.davidson@hklaw.com

*Counsel for Plaintiff*

                                                 */s/ Robert W. Horton*

48769984.8

14

Case 3:25-cv-01210     Document 18-1     Filed 11/05/25     Page 14 of 14 PageID #: 200